No. 21-16227

———————————————

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

STATE OF ARIZONA,
Plaintiff-Appellant,
v.
JANET YELLEN, in her official capacity as
Secretary of the Treasury, *et al.*,
Defendant-Appellees.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
Case No. 2:21-cv-00514-DJH

———————————————

**ARIZONA'S OPENING BRIEF**

———————————————

MARK BRNOVICH
ATTORNEY GENERAL

Joseph A. Kanefield
   *Chief Deputy & Chief of Staff*

Brunn ("Beau") W. Roysden III
*Solicitor General*

Drew C. Ensign
   *Deputy Solicitor General*
Wilson C. Freeman
   *Senior Litigation Counsel*
Robert J. Makar
   *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (802) 542-5025
Drew.Ensign@azag.gov

*Counsel for the State of Arizona*

Dated: August 20, 2021

# TABLE OF CONTENTS

PAGE

Table Of Authorities.............................................................. 31

Introduction ........................................................................ 31

Statement Of Jurisdiction.................................................... 6

Issues Presented For Review ............................................... 7

Statement Of The Case ........................................................ 7

    Legal Background ............................................................ 7

    Factual And Procedural Background............................. 11

    Proceedings Below.......................................................... 18

    Treasury's Interim Final Rule...................................... 20

    Consolidation Under Rule 65(a)(2)............................... 22

    District Court's Decision ............................................... 23

Summary Of The Argument ............................................... 26

Standards Of Review........................................................... 31

Argument ............................................................................ 31

I.    The State Has Article III Standing To Challenge The Tax
    Mandate..................................................................... 31

    A.    Standing Must Be Evaluated Separately From The
        Merits................................................................. 33

    B.    The Compliance Costs Imposed By The Tax Mandate
        Confer Standing ................................................. 34

   1. The Compliance Costs Are Cognizable Injury ............ 34

   2. The State Will Incur Compliance Costs ...................... 35

   3. The District Court's Contrary Holding Conflated The Standing And Merits Inquiries ............................. 35

  C. The Alleged Ambiguity Of The Tax Mandate Inflicts Cognizable Sovereign Injury On The State ......................... 39

   1. Arizona Had A Right To An Offer It Could "Voluntarily And Knowingly Accept" ........................... 39

   2. The District Court Wrongly Conflated The Merits In Judging the States' Interest ................................... 41

  D. Arizona Suffers An Injury Because The ARPA Coerced The State And Effectively Commandeered State Taxing Authority ................................................................... 43

  E. Arizona Suffers A Realistic Danger Of Enforcement Of The Tax Mandate ................................................................ 45

II. The Tax Mandate Is Unconstitutional .......................................... 48

  A. The Tax Mandate's Palpable Ambiguity Violates The Constitution ........................................................................ 49

   1. The Tax Mandate Is Patently Ambiguous ................... 49

   2. The Tax Mandate's Ambiguity Is Apparent From DOJ's And Treasury's Conflicting Interpretations Of It ......................................................................... 54

   3. The Supreme Court's Precedents Demand Clarity As To What The Conditions Imposed Actually Are—Not Their Mere Existence ................................... 56

   4. Treasury's Rule Cannot Cure The Tax Mandate's Ambiguity .................................................................. 61

   5. Treasury's Rule Does Not Offer Sufficient Clarity To Give The States Clear Notice ................................. 64

  B. The Tax Mandate Is Not Related To ARPA's Purposes ....... 67

C.    ARPA Unconstitutionally Coerces States Into
Accepting The Tax Mandate ................................................ 69

Conclusion ................................................................................. 74

# TABLE OF AUTHORITIES

## CASES

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ........................................................................ 34, 43

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
548 U.S. 291 (2006) .......................................... 3, 9, 29, 50, 51, 58, 59, 60

*Babbitt v. Farm Workers,*
442 U.S. 289 (1979) ........................................................................ 45, 47

*Bennett v. Kentucky Dep't of Educ.,*
470 U.S. 656 (1985) ................................................................................ 64

*Brackeen v. Haaland,*
994 F.3d 249 (5th Cir. 2021) ................................................................. 35

*California Trucking Ass'n v. Bonta,*
996 F.3d 644 (9th Cir. 2021) ........................................................... 45, 46

*California v. Texas,*
141 S. Ct. 2104 (2021) ........................................................................... 36

*Cath. League for Religious & C.R. v. City & Cty. of San Francisco,*
624 F.3d 1043 (9th Cir. 2010) ............................................................... 33

*Charles C. Steward Mach. Co. v. Davis,*
301 U.S. 548 (1937) .................................................................................. 8

*City of Philadelphia v. Sessions,*
280 F. Supp. 3d 579 (E.D. Pa. 2017) ..................................................... 68

*Clark v. City of Lakewood,*
259 F.3d 996 (9th Cir. 2001) ................................................................. 34

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................................... 34

*Contender Farms, L.L.P. v. USDA,*
   779 F.3d 258 (5th Cir. 2015) .............................................................. 35

*Coyle v. Smith,*
   221 U.S. 559 (1911) ............................................................................ 43

*D.C. v. Heller,*
   554 U.S. 570 (2008) .............................................................................. 3

*Free Enter. Fund v. Pub. Accounting Oversight Bd.,*
   561 U.S. 477 (2010) ............................................................................ 47

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ....................................................................... 7, 62

*Kentucky v. Yellen,*
   21-cv-00017 (filed E.D. Ky. Apr. 6, 2021) ......................................... 17

*King v. Burwell,*
   576 U.S. 473 (2015) ............................................................................ 63

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................... 32, 41

*Lutheran Church-Missouri Synod v. FCC.,*
   141 F.3d 344 (D.C. Cir. 1998) ............................................................ 35

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ............................................................................ 32

*Mayfield v. United States,*
   599 F.3d 964 (9th Cir. 2010) .............................................................. 31

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) ............................ 4, 24, 42, 56, 57, 58, 67

*MedImmune, Inc. v. Genentech,*
   549 U.S. 118 (2007) ............................................................................ 47

*Miller v. Gammie,*
   335 F.3d 889 (9th Cir. 2003) .............................................................. 61

*Missouri v. Yellen,*
  21-cv-00376 (filed E.D. Mo. Mar. 29, 2021) ........................................ 17

*Murphy v. NCAA,*
  138 S. Ct. 1461 (2018) ........................................................................ 43

*National Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................. 8, 9, 10, 25, 39, 44, 51, 60, 62, 69, 70, 73

*New State Ice Co. v. Liebmann,*
  285 U.S. 262 (1932) ............................................................................ 71

*New York v. United States,*
  505 U.S. 144 (1992) ........................................... 8, 43, 44, 67, 70, 71, 72

*Ohio v. Secretary, Dep't of Treasury,*
  21-cv-00181 No. 1. (filed S.D. Ohio Mar. 17, 2021) ............................. 17

*Ohio v. Yellen,*
  No. 1:21-CV-181 (S.D. Ohio July 1, 2021) ......................... 40, 53, 62, 63

*Oregon v. Trump,*
  406 F. Supp. 3d 940 (D. Or. 2019) ...................................................... 44

*Parker v. D.C.,*
  478 F.3d 370 (D.C. Cir. 2007) ................................................. 3, 28, 33, 44

*Pennhurst State School and Hospital v. Halderman,*
  451 U.S. 1 (1981) ................................................................. 8, 9, 10, 17, 49

*Printz v. United States,*
  521 U.S. 898 (1997) ............................................................................ 70

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
  547 U.S. 47 (2006) .............................................................................. 40

*South Dakota v. Dole,*
  483 U.S. 203 (1987) .................................................................. 9, 10, 73

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ................................................................. 32, 42

*State v. Yellen,*
   No. 1:21-CV-181, 2021 WL 1903908 (S.D. Ohio May 12, 2021) .......... 59

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) .............................................................. 32

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ....................................................... 18, 45

*Texas v. EEOC,*
   933 F.3d 433 (5th Cir. 2019) ................................................ 35

*Texas v. Yellen,*
   21-cv-00079 (filed N.D. Tex. May 3, 2021) ............................... 17

*Thomas v. Anchorage Equal Rights Comm'n,*
   220 F.3d 1134 (9th Cir. 2000) .............................................. 45

*United States v. Butler,*
   297 U.S. 1 (1936) ............................................................... 8

*United States v. Younger,*
   398 F.3d 1179 (9th Cir. 2005) .............................................. 31

*Va. Dep't of Educ. v. Riley,*
   106 F.3d 559 (4th Cir. 1997) (en banc) .............................. 61, 62

*Van v. LLR, Inc.,*
   962 F.3d 1160 (9th Cir. 2020) .............................................. 35

*Warth v. Seldin,*
   422 U.S. 490 (1975) ................................................... 3, 28, 32

*West Virginia v. Dep't of the Treasury,*
   21-cv-00465, 2021 WL 2952863 (N.D. Ala. Jul. 14, 2021) ................. 40

*West Virginia v. Yellen,*
   21-cv-00465 No. 1 (filed N.D. Ala. Mar. 31, 2021) ....................... 17

## STATUTES

42 U.S.C. §2000cc-1(b)(1) ....................................................... 57

42 U.S.C. §802(b)(3) ............................................................ 12

42 U.S.C. §802(c)(1) ............................................................ 13

42 U.S.C. §802(c)(2) ............................................................ 13

42 U.S.C. §802(c)(2)(A) ................................... 2, 14, 37, 67

42 U.S.C. §802(d) ................................................................ 37

42 U.S.C. §802(d)(2)(B) ..................................................... 24

42 U.S.C. §802(e) ................................................................ 14

42 U.S.C. §802(f) ................................................................ 14

42 U.S.C. §802(g)(1) ................................................... 14, 41

Pub. L. No. 117-2 §9901 (2021) ..................................... 11

## OTHER AUTHORITIES

*Coronavirus State and Local Fiscal Recovery Funds*, U.S. Dept. of the
Treasury, https://home.treasury.gov/policy-
issues/coronavirus/assistance-for-state-local-and-tribal-
governments/state-and-local-fiscal-recovery-funds (last visited Aug.
18, 2021) ............................................................................. 11

*FACT SHEET: The American Rescue Plan Will Deliver Immediate
Economic Relief to Families*, U.S. Dept. of Treasury (Mar. 18, 2021),
https://home.treasury.gov/news/featured-stories/fact-sheet-the-
american-rescue-plan-will-deliver-immediate-economic-relief-to-
families ............................................................................... 12

Final Engross Budget Bills, Arizona Joint Legislative Budget
Committee (June 30, 2021),
https://www.azleg.gov/jlbc/FY22budgetbillsfinal063021.pdf .............. 12

*The Quarterly CARES Act Report to Congress*, U.S. Senate Committee
on Banking, Housing and Urban Affairs (2021),
https://www.banking.senate.gov/hearings/03/17/2021/the-quarterly-
cares-act-report-to-congress (approx. 1:10:00 – 1:15:00) .................... 16

U.S. Dep't of the Treasury, *Coronavirus State and Local Fiscal Recovery Funds*, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/state-and-local-fiscal-recovery-funds ....................................................................................... 12

## RULES

Fed. R. Civ. P. 65(a)(2) ............................................................. 22

## REGULATIONS

86 Fed. Reg. 26,786 (May 17, 2021)... 20, 21, 22, 35, 36, 37, 46, 55, 65, 66

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. X .................................................................. 7

U.S. Const. Art. I. §8 cl. 1......................................................... 7

## INTRODUCTION

The district court below committed a fundamental and patent error: it failed to evaluate standing/jurisdiction separately from the constitutional merits, instead blending them together into one muddled mess. The district court skipped past jurisdiction to resolve the merits and, having done so, then jumped back to jurisdiction to hold the State of Arizona ("State") lacked Article III *standing* because, in its view, the State's constitutional claims failed. And it did so while simultaneously professing there was a "lack of subject matter jurisdiction" to resolve the very issues it had just decided. 1-ER-11. In doing so, the district court erred in both its explicit standing and merits holdings. This Court should reverse both errors.

This case involves potentially one of the most aggressive encroachments upon state sovereignty ever enacted by Congress in the history of the Republic. The provision at issue is part of the American Rescue Plan Act of 2021 ("ARPA," or the "Act"). Specifically, Section 9901 of the Act (hereinafter, the "Tax Mandate") prohibits the States from using ARPA moneys "to either directly *or indirectly* offset" any reduction

in net tax revenue as a result of a tax policy change. 42 U.S.C. §802(c)(2)(A) (emphasis added).

The Tax Mandate's principal sponsor was perfectly clear that the provision was intended to supplant the system of separate sovereigns fundamental to the Constitution, in which both the federal and state governments have independent taxing power. In its place, Congress alone would dictate taxing policy to the States by imposing a one-way ratchet—*i.e.*, Congress would henceforth only permit States to *raise* taxes, rather than cut them, until 2025.

Or the provision alternatively might be a simple and inoffensive restriction on how the States spend particular federal funds directly and nothing more. The statutory text is not only hopelessly ambiguous as to what it actually means, but the Federal Defendants (the "Secretary") and the Department of Justice remarkably have given it *mutually exclusive readings* during the pendency of this litigation.

That is the principal rub here. Those dueling potential readings demonstrate the Tax Mandate's patent ambiguity. And such ambiguity violates the Constitution, which demands that spending conditions give States "clear notice" so they can make a knowing and voluntary choice on

whether to accept. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

The district court's conflation of merits and standing is perhaps best seen in its rejection of the State's assertion of standing based on compliance costs imposed by the Tax Mandate. The district court held that such costs do not support Article III standing not because they don't exist—they plainly do. The long pages of dense, complex regulations imposing extensive and repeating reporting requirements are an accountant's dream and a budgeter's nightmare. Instead, the district court reasoned that the compliance costs could not be "declared injurious for purposes of standing" because they were "within the Secretary's power" to impose—*i.e.*, they did not violate the Constitution. 1-ER-9. But this squarely violates the Supreme Court's repeated recognition that "standing in no way depends on the merits," and the two should not be conflated. *Warth v. Seldin*, 422 U.S. 490, 500 (1975). The district court was thus supposed to "assume *arguendo* the merits of [the State's] legal claim" when evaluating standing. *See Parker v. D.C.*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008). It failed to do so.

The district court similarly rejected the State's standing based on sovereign injury resulting from the Tax Mandate's ambiguity by effectively holding that the Tax Mandate was constitutional. 1-ER-6-8. It tellingly distinguished a decision of the Southern District of Ohio which held that Ohio had Article III standing to bring a virtually identical challenge *solely* by relying (wrongly) on this Court's decision in *Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002). 1-ER-8 n.2. But *Mayweathers* is *purely* a constitutional *merits* decision. It does not use the word "standing" even once. The district court's reliance on *Mayweathers* to resolve the *standing* inquiry again underscores the district court's pervasive conflation of standing and merits.

Moreover, the district court's merits analysis is as clearly flawed as its improper intermingling of jurisdiction and merits issues. The district court simply read out of existence the Supreme Court's explicit and repeatedly expressed requirement that any conditions Congress imposes under the Spending Clause be unambiguous. In the district court's view, the Supreme Court's entire requirement of clarity in conditions was mere "dicta," which was readily cast aside, and the Supreme Court had in fact explicated no binding Spending Clause requirements "beyond the issue

of whether a condition existed." 1-ER-7. The district court thus accepted the Secretary's explicit argument (2-ER-85; 2-ER-57 at 36:10-20) that it was constitutionally sufficient that Congress "mak[es] the *existence* of a condition known," 1-ER-8 (emphasis in original)—*i.e.*, the States need only know the condition *exists*, not what it actually does. In Let's-Make-A-Deal terms, Congress need not reveal anything about what is behind Door Number 2, as long as it makes clear that the States get that door and not Door Number 1 or 3. But that cannot possibly be the law, and indeed the Supreme Court's decision in *Arlington* is directly contrary to the district court's radical rewriting of it.

Moreover, while *Mayweathers* (which predates *Arlington* and *NFIB*) may establish that Congress need not answer every conceivable question about the contours of Congress's conditions, the ambiguity here is so profound that it flunks any requirement of clarity as to what the conditions actually *do*. At issue here is whether Congress has provided the states with sufficiently clear notice such that they can knowingly and voluntarily agree to the conditions. This limitation is critical to protect federalism and to protect states' interests.

Indeed, the profound ambiguity of the Tax Mandate is obvious just by looking only to the Secretary's/DOJ's shifting positions and admissions. Secretary Yellen, for example, admitted to Congress that the Tax Mandate created a "a host of thorny questions." 3-ER-362-65. But unambiguous language should raise no "thorny questions"—let alone a full-blown "host of" them—since the answers are supposed to be clear from the text itself. Secretary Yellen similarly told Congress that "given the fungibility of money, it's a hard question to answer" what the effect of the Tax Mandate would be. 3-ER-362-65. But it could only be a "hard question" for the Treasury Department to answer —or the States for that matter—if the statutory text were ambiguous. Because it is, the State both has Article III standing and is entitled to judgment on the constitutional merits.

## STATEMENT OF JURISDICTION

The district court denied injunctive relief and entered final judgment in favor of Defendants on July 22, 2021. 1-ER-2-12. The State filed a timely notice of appeal the next day. 3-ER-375-77. This Court has jurisdiction under 28 U.S.C. §§1291 and 1292(a).

## ISSUES PRESENTED FOR REVIEW

This appeal presents two overarching issues:

(1)    Whether the State has Article III standing to challenge the Tax Mandate as exceeding Congress's constitutional authority.

(2)    Whether the Tax Mandate exceeds Congress's constitutional authority.

## STATEMENT OF THE CASE

### Legal Background

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). The "Federal Government" is one of "limited powers" that are enumerated in the Constitution. *Id.* at 457. And the powers not delegated to that government are "reserved to the States respectively, or to the people." U.S. Const. amend. X.

Among the powers delegated to Congress is "to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. Art. I. §8 cl. 1. Known as the "spending clause," this language—particularly the meaning of "general Welfare"—has been the subject of continual debate since the founding. *See, e.g.*, *United States v.*

*Butler*, 297 U.S. 1, 65 (1936) (discussing "sharp differences of opinion" since the founding).

Today it is well-established that while Congress's Spending Clause power is "broad," it is subject to important limitations. *See*, *e.g.*, *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012) (Roberts, C.J.) ("*NFIB*"). Exercising this power, Congress may grant funds to the States. And Congress may "condition such a grant upon the States' 'taking certain actions that Congress could not [directly] require them to take.'" *Id.* at 576 (quotation marks omitted). Those conditions even "may influence a State's legislative choices." *New York v. United States*, 505 U.S. 144, 167 (1992).

This arrangement rests in substantial nature upon the recognition that States are sovereigns, and "[e]ven sovereigns may contract without derogating from their sovereignty." *Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 597 (1937). Accordingly, "[t]he legitimacy of Congress's exercise of the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB*, 567 U.S. at 577 (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981)) (cleaned up). Accordingly, the

Supreme Court has repeatedly reaffirmed that the *legitimacy* of the exercise of the Spending Power depends on the States being able to knowingly and voluntarily agree to the conditions imposed.

Conditional grants under the Spending Clause are thus "in the nature of a contract," and the States, as separate sovereigns, cannot be held to conditions they do not "voluntarily and knowingly" agree to. *Pennhurst*, 451 U.S. at 17. The Supreme Court has gone so far as to explain that conditions in federal grants to states must be viewed "from the perspective of a state official who is engaged in the process" of deciding whether to accept the funds. *Murphy*, 548 U.S. at 296. "And just as a contract is voidable if coerced," a provision which obtains State consent that is not "voluntar[y] and knowing[]" is invalid. *See NFIB*, 567 U.S. at 676 (Scalia, J., dissenting) (emphasis omitted).

In 1987, in *South Dakota v. Dole*, the Supreme Court surveyed its own case law and summarized the "general restrictions" on the exercise of the Spending Power that it had recognized in the context of conditional grants. 483 U.S. 203, 207-08 (1987). There are five main limitations.

- ***General Welfare.*** First, as Article I says, the expenditures must be in pursuit of "the general welfare," as opposed to local interests. *Id.*

- ***Unambiguous Clarity.*** Second, to respect the role of States as separate sovereigns, any condition imposed must be "unambiguous[,] ... enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (quoting *Pennhurst*, 451 U.S. at 17).

- ***Relatedness.*** Third, conditions on federal grants must be related to the federal interest in the national program. *Id.*

- ***Comports with Other Constitutional Requirements.*** Fourth, other constitutional provisions may provide an independent bar to the conditional grant of federal funds. *Id.*

In addition to these restrictions, *Dole* also acknowledged that the principle of knowing and voluntary agreement meant that "financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at 211; *see also NFIB*, 567 U.S. at 580-82 ("The threatened loss of over 10 percent of a State's overall

budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce.").

This appeal presents the questions of (1) whether States have Article III standing to bring challenges to Spending Clause-imposed conditions alleged to violate these constitutional requirements and (2) whether the Tax Mandate does so.

## Factual And Procedural Background

### *The American Rescue Plan Act ("ARPA")*

The COVID-19 pandemic caused a major economic downturn. In response to this downturn, Congress passed the American Rescue Plan Act ("ARPA" or "Act"). *See* Pub. L. No. 117-2 §9901 (2021) (amending 42 U.S.C. §802). Among many other provisions, the Act provides for a $195.3 billion aid program, payable directly to the States.[1] ARPA also provides $45.6 billion to cities and another $65.1 billion to counties.[2]

---

[1] *See* 42 U.S.C. §802. *See also Coronavirus State and Local Fiscal Recovery Funds*, U.S. Dept. of the Treasury, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/state-and-local-fiscal-recovery-funds (last visited Aug. 18, 2021).

[2] *Id.*

Alongside these grants to States, ARPA provides substantial direct payments to taxpayers and other tax relief. For example, the ARPA provides for an expansion in the Child Tax Credit, giving an additional $1000-$1600 per child to certain taxpayers.[3]

Arizona expects to receive approximately $4.2 billion from the state and local aid program under the Act. 42 U.S.C. §802(b)(3).[4] This figure represents approximately 33% of Arizona's total budget for fiscal year 2022.[5]

ARPA provides that these aid funds may only be used to cover certain expenditures:

_____

[3] *See FACT SHEET: The American Rescue Plan Will Deliver Immediate Economic Relief to Families*, U.S. Dept. of Treasury (Mar. 18, 2021), https://home.treasury.gov/news/featured-stories/fact-sheet-the-american-rescue-plan-will-deliver-immediate-economic-relief-to-families. It also provides billions in rental and homeowner assistance and waives federal income taxes on unemployment benefits. *Id.*

[4] *See also* U.S. Dep't of the Treasury, *Coronavirus State and Local Fiscal Recovery Funds*, https://home.treasury.gov/policy-issues/coronavirus/assistance-for-state-local-and-tribal-governments/state-and-local-fiscal-recovery-funds.

[5] *See* Final Engrossed Budget Bills, Arizona Joint Legislative Budget Committee (June 30, 2021), https://www.azleg.gov/jlbc/FY22budgetbillsfinal063021.pdf.

> "(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID-19) or its negative economic impacts…;
>
> "(B) to respond to workers performing essential work during the COVID-19 public health emergency by providing premium pay…;
>
> "(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID-19 public health emergency…; or
>
> "(D) to make necessary investments in water, sewer, or broadband infrastructure.

42 U.S.C. §802(c)(1) to the SSA). ARPA also provides that no state or territory may "use the funds under this section for deposit into any pension fund." *Id.* §802(c)(2). These foregoing conditions/limitations are not at issue here.

In addition to these limitations, ARPA contains a provision, referred to generally as the Tax Mandate, which states in full:

> "A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) of this title to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."

*Id.* §802(c)(2)(A). The provision does not affect the ability of local governments (or Congress) to cut taxes. *Id.*

Nothing in the statute or committee reports lends additional clarity to the meaning of this limitation. Reporting indicates that the provision was added at the insistence of Senator Manchin, who provided the decisive vote in favor of ARPA. 3-ER-337-42. Senator Manchin made his intent clear in statements: "states should not be cutting taxes at [this] time." 3-ER-288-98.

The Tax Mandate covers the period from March 3, 2021 through the "last day of the fiscal year" in which a State spends or returns all its ARPA money. 42 U.S.C. §802(g)(1). The ARPA further provides that a state that violates the Tax Mandate must repay to the Treasury the lesser of the amount of the tax reduction or the total amount of funds received. *Id.* §802(e). The Act does not provide the states with any specific process to challenge recoupments by the Treasury Department.

Lastly, the Secretary may "issue such regulations as may be necessary or appropriate to carry out this section." *Id.* §802(f).

*Pre-Suit Activities*

Following the Tax Mandate's eleventh-hour insertion into ARPA, numerous commentators began to take note of the Tax Mandate and to question its scope. *See, e.g.*, 3-ER-256-61, 268-81, 288-98. Several commentators raised concerns as to the ambiguity of this provision. Commentators especially questioned what the Tax Mandate means when it prohibits states from "either directly or indirectly offset[ting] a reduction" in net tax revenue. *See, e.g.* 3-ER-268-81, 282-87. ("As Daniel Hemel, a law professor at the University of Chicago and an expert on tax law, told me, 'money is fungible, so I'm not quite sure what it means for the funds to indirectly offset a reduction in net tax revenue resulting from a tax cut.'").

To help answer some of these uncertainties, on March 16, 2021, the State's attorney general, joined by 21 of his peers, wrote to Secretary Yellen asking for clarification on the Tax Mandate's scope. 3-ER-313-20. That letter set forth specific examples for the Treasury to provide guidance as to whether the Tax Mandate would apply. 3-ER-313-20.

Secretary Yellen subsequently sent the state attorneys general a short response, declining to address any of the specific examples. 3-ER-

334-36. The letter appeared to suggest that the States could cut taxes if they did not specifically claim that ARPA funds are the basis of the offsetting funds: "Nothing in the Act prevents States from enacting a broad variety of tax cuts." 3-ER-334-36. But at the same time, Secretary Yellen stated "the limitations of the Act [would] not [be] implicated" if States cut taxes and "replac[ed] the lost revenue through other means." 3-ER-334-36.

On March 24, 2021, Secretary Yellen testified at a hearing of the U.S. Senate Committee on Banking, Housing, and Urban Affairs. There, she was asked how she intended to approach the Tax Mandate.[6] In response to questions about the scope of the Tax Mandate's "indirectly offset" language, the Secretary conceded that the Tax Mandate raises "a host of thorny questions," and "given the fungibility of money, it's a hard question to answer." 3-ER-362-65.

---

[6] *See The Quarterly CARES Act Report to Congress*, U.S. Senate Committee on Banking, Housing and Urban Affairs (2021), https://www.banking.senate.gov/hearings/03/17/2021/the-quarterly-cares-act-report-to-congress (approx. 1:10:00-1:15:00). *See also* 3-ER-362-65 (discussing testimony).

***Tax Mandate Litigation***

This suit is one of at least six brought by a total of 21 states challenging the Tax Mandate,[7] and was filed on March 25, 2021. 3-ER-371-74.

Arizona's complaint asserts two constitutional claims: The first alleges that the Tax Mandate is "ambiguous and fails to give the State clear notice of what it means." 3-ER-372 ¶56. As a result, the State cannot "voluntarily and knowingly accept" the condition. *See Pennhurst*, 451 U.S. at 17. The second count alleges that, to the extent the provision unambiguously prohibits the States from cutting taxes in any manner without forfeiting ARPA funds, it is (1) unrelated to the federal interest as set forth in the ARPA; it (2) unconstitutionally subverts the federal nature of the constitution; and (3) effectively coerced the State into surrendering its sovereign taxing authority. 3-ER-374 ¶¶66-68.

---

[7] *See Texas v. Yellen*, 21-cv-00079 (filed N.D. Tex. May 3, 2021) (on behalf of three states); *Kentucky v. Yellen*, 21-cv-00017 (filed E.D. Ky. Apr. 6, 2021) (on behalf of two states); *Missouri v. Yellen*, 21-cv-00376 (filed E.D. Mo. Mar. 29, 2021); *West Virginia v. Yellen*, 21-cv-00465 No. 1 (filed N.D. Ala. Mar. 31, 2021) (on behalf of 14 states); *Ohio v. Secretary, Dep't of Treasury*, 21-cv-00181 No. 1. (filed S.D. Ohio Mar. 17, 2021).

## **Proceedings Below**

The State moved for a preliminary injunction, and briefing was complete on that motion on May 11, 2021.

In opposing the State's request, Defendants contended that Arizona lacked standing, largely relying on its contention that the State's "asserted injuries are hypothetical and speculative" and because Arizona had not alleged an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and … a credible threat of [enforcement] thereunder." 2-ER-81 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted)).

Defendants did not contest that Arizona's Legislature was considering, at the time, numerous tax cutting plans. Instead, Defendants' standing argument rested, in large part, on DOJ's then-prevailing construction of the Tax Mandate. Under that interpretation, Defendants contended that Arizona had failed to allege any specific plans for a tax cut which "offsetted" a particular use of Rescue Plan Funds. 2-ER-81-82. In particular, Defendants contended at that time that "[t]he offset provision only restricts using Rescue Plan funds to offset a

reduction in net tax revenue resulting from a change in law, not any tax change on its own." 2-ER-82.

Along the same lines, DOJ argued that that the Tax Mandate was not ambiguous because the term 'use' in the statute limited its application to "volitional" or "active employment" of federal funds. 2-ER-83. Under this "unambiguous" reading, "[the Tax Mandate's] language simply ensures that the federal funds are not employed to finance state tax cuts that decrease net tax revenue." 2-ER-83.

Finally, Defendants contended that Tax Mandate did not prevent the State from cutting taxes provided it did not directly use ARPA funds to do so. In DOJ's April-2021 view, that was so because both "directly" and "indirectly" were mere "adverbs that can-not alter the meaning of the word that they modify (here, 'offset')." 2-ER-83 (quotion marks omitted). As a result, Defendants argued that the State lacked a reasonable fear of enforcement given that "indirectly" was incapable of modifying "offset" and thus was incapable of broadly encumbering the State's fiscal sovereignty. 2-ER-83

***Treasury's Interim Final Rule***

While Arizona's motion was pending, the Treasury Department issued the Interim Final Rule, implementing provisions of ARPA, including the Tax Mandate. *See* Coronavirus State and Local Fiscal Recovery Funds, 86 Fed. Reg. 26,786 (May 17, 2021) ("IFR"). The IFR was notable for advancing an interpretation of the Tax Mandate plainly at odds with its briefs below (as well as those in other district courts across the country).

Specifically, the IFR states that a State will "be considered to have used [ARPA funds] to offset a reduction in net tax revenue resulting from changes in law, regulation, or interpretation if, and to the extent that, the recipient government could not identify sufficient funds from sources other than the Fiscal Recovery Funds to offset the reduction in net tax revenue." *Id.* at 26,807.

The IFR then goes on to lay out a complex, four-step process for identifying direct and indirect offsets, which makes plain that, in Treasury's view, "indirectly" does indeed modify "offset." First, States must "identify and value" any actions which could reduce tax revenue. *Id.* at 26,807. Second, States must determine the total projected revenue

loss and, if that figure is less than a "de minimis level," there is no need to identify any way to pay for the changes. *Id.* Third, at the end of the fiscal year, if a state's annual tax revenue exceeds than the amount received for fiscal year ending in 2019 (adjusted annually for inflation), they are in a "safe harbor" and do not violate the tax mandate. *Id.* Fourth, if the loss is not de minimis or the State is not within the safe harbor, then the State must "identify any sources of funds" that have been used to offset the total value of the tax changes. *Id.*

Under the IFR (and contrary to the brief filed below), a state need not "volitionally" employ ARPA funds to pay for a tax cut to violate the "indirectly … offset" condition. Instead, the IFR recognizes that "money is fungible" and specifically states that "even if Fiscal Recovery Funds are not explicitly or directly used to cover the cost of changes that reduce net tax revenue, those funds may be used in a manner inconsistent with the statute by indirectly being used to substitute for" a tax revenue reduction in a manner amounting to an indirect offset. *Id.* at 26,807.

Finally, the IFR puts States effectively under a monitoring regime until the end of the covered period (2024). The IFR requires States to report "[a]ctual net tax revenue," "[e]ach revenue-reducing change made"

in a year and the value of that change, "[e]ach revenue-raising change" and its value, and each spending cut used to pay for a revenue reduction plus its value plus "documentation demonstrating that" the cut can pay for the revenue reduction under the rule. *Id.* at 26,810.

The IFR expressly states that it "will generate administrative costs relative to a pre-statutory baseline … includ[ing], chiefly, costs required to … file periodic reports with Treasury." *Id.* at 26,817. "Treasury lack[ed] data to estimate the precise extent to which this interim final rule generates administrative burden for State, local, and Tribal governments," but did not doubt that it was non-zero, and accordingly sought "comment[s] to better estimate and account for these costs, as well as on ways to lessen administrative burdens." *Id.*

### Consolidation Under Rule 65(a)(2)

Rule 65(a)(2) provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2). After the district court filed an order inquiring whether a preliminary injunction would provide effective relief, the State moved for consolidation on June 15, 2021. Without waiting for Defendants to file a

response, the district court *sua sponte* denied the State's request as "untimely." 1-ER-15. That order did not identify any prejudice.

After the State pointed out that Rule 65(a)(2) provides that requests for consolidation are expressly permitted to be made even "after beginning the hearing," 2-ER-78, n.1, the district court granted consolidation and permitted the parties to provide a final round of briefing. 1-ER-13.

### District Court's Decision

The district court issued its decision on July 22, dismissing the case for want of jurisdiction. The Court determined that Arizona had failed to show an injury-in-fact, and so lacked standing. In doing so, it did not distinguish jurisdictional and merits issues, and appeared to rest its standing conclusions largely on merits-based reasoning. In holding the State lacked Article III standing, the district court discussed five potential injuries and rejected each in turn.

First, the district court concluded that Arizona had not suffered any sovereign injury because Arizona had no sovereign right to know the *content* of the conditions attached to federal grants at all. 1-ER-6-7. In its view, *Pennhurst* and *Arlington* stood only for the proposition that States

had a sovereign interest to know about the *existence* of conditions, not their content. 1-ER-6. Because Congress made "the existence of the condition" obvious in the Tax Mandate, it did not matter whether a State could discern what it actually did. 1-ER-7-8 (quoting *Mayweathers*, 314 F.3d at 1067).

Second, the district court determined that Arizona's policymakers had suffered no harm from any ambiguity because "Arizona had offered no concrete facts showing" how the Tax Mandate had impacted policymakers. 1-ER-9. Furthermore, relying on its conclusion regarding Arizona's sovereign rights (or lack thereof), Arizona was not entitled to any greater certainty than it received. 1-ER-9.

Third, the Court held that any compliance costs which Arizona faced under the IFR and the ARPA were not cognizable injury. 1-ER-9. It did not doubt that such costs existed, but reasoned that they could not be "declared injurious for purposes of standing" because "it is within the Secretary's power, under ARPA, to request" the information needed to administer the Tax Mandate. 1-ER-9. (citing 42 U.S.C. §802(d)(2)(B) (requiring States to produce "such other information as the Secretary may require)). The district court did not consider whether the Secretary

would have power to request information to enforce an unconstitutional provision, but instead assumed that the Secretary's exercise of her power pursuant to the IFR was constitutional.

Fourth, the court held that Arizona had not shown a realistic danger of enforcement of the Tax Mandate against it because Arizona failed to show that it "used ARPA funds to supplement a reduction in its net income." 1-ER-10. Notwithstanding the $1.9 billion dollar tax cuts passed by the Arizona Legislature in June, the Court held there was no danger of enforcement because Arizona could not show specifically "how the Restriction could apply" to its multi-billion-dollar tax cuts. 1-ER-10; *see also* 2-ER-21.

Lastly, the Court held that any coercive force of the Tax Mandate did not injure Arizona because "ARPA will not revoke any federal funding Arizona enjoyed prior to accepting" ARPA funds. 1-ER-11. Furthermore, Arizona had not shown that *it* had undergone financial strain as a result of the COVID-19 pandemic, as opposed to the States generally. 1-ER-11. Accordingly, the billions of dollars at stake in the ARPA did not amount to "economic dragooning" under *NFIB*. 1-ER-11. (quoting *NFIB*, 567 U.S. at 582 (Roberts, C.J.)). In doing so, the district court apparently

considered the issue of whether the level of coercion presented was constitutional (or not) to be a jurisdictional rather than merits question.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court's opinion hopelessly conflated standing and merits issues and erred in its resolution of both. In rejecting most of the State's bases for Article III standing, the district court expressly worked backwards from an (erroneous) merits conclusion to hold that the State lacked standing—even while disclaiming that it had jurisdiction to reach the very issues it had obviously just decided. Moreover, its merits-based decisions were plainly wrong and squarely violated controlling Supreme Court precedent, which the district court blithely dismissed as mere dicta. This Court should reverse.

One clear example of the district court's merits-first approach came in analyzing whether the State's compliance costs conferred Article III standing to challenge the Tax Mandate. 1-ER-9. The district court did not doubt that such compliance costs existed. 1-ER-9. That alone mandated a conclusion that the State had standing to challenge the law imposing those costs, which the district court could then—and *only* after resolving

standing—decide whether that law was constitutional. Instead, the district court flipped the script: it reasoned that the State's compliance costs could not be "declared injurious for purposes of standing" because "it is within the Secretary's power" to impose them. 1-ER-9. But it is axiomatic that the Secretary has no power to enforce an unconstitutional law, and the district court's opinion cannot be understood as anything other than an implicit (and inescapable) determination that the Tax Mandate was constitutional—thereby resolving an issue it explicitly disclaimed jurisdiction to reach.

Similarly, as to the State's argument that the Tax Mandate's alleged ambiguity inflicts sovereign injury, the district court inverted the proper mode of analysis. It began with this Court's decision in *Mayweathers*—which is not even arguably a standing case. 1-ER-7. Relying on *Mayweathers*, it then held, wrongly, that Congress need not inform the States of what the *content* of conditions attached to federal grants is, as long as it informs the States of the *existence* of the condition. 1-ER-8. And from that substantive holding about what the Constitution requires, it then worked backwards to hold that the State lacked standing. 1-ER-8.

None of this analysis is tenable. Because "standing in no way depends on the merits," *Warth*, 422 U.S. at 500, the district court for standing purposes should have "assume[d] *arguendo* the merits of [the State's] legal claim." *Parker*, 478 F.3d at 377. Thus, because the State had validly alleged that the Tax Mandate was unconstitutionally ambiguous and thereby violated a constitutional requirement created for its benefit and protection, the district court should have assumed for standing purposes that the Tax Mandate was unconstitutionally ambiguous. It did not. Instead, it started with its own merits-based determination of what the Constitution means—*i.e.*, only requiring that Congress disclosure of the existence of conditions, not what they actually are—and worked backwards from there.

These are only the most obvious standing errors. As explained below, the State also has standing based on the application of ARPA's coercive force against the State, the impact on the State's ability to budget, and the reasonable danger of enforcement of the Tax Mandate against the State. The district court erred in rejecting all of these bases, frequently doing so by again conflating merits and standing issues.

It is entirely unclear how the district court thought it had jurisdiction to declare what the Constitution means in light of its holding that it lacked subject matter jurisdiction. But it is perfectly clear that this merits holding is plainly wrong. The Supreme Court in *Arlington* addressed whether a condition was sufficiently clear to require the States to pay experts fees to prevailing parties. 548 U.S. at 295. The existence of *a* condition was indisputable (and undisputed). If the district court's existence-only theory were correct, the Supreme Court should have stopped there and affirmed. But it instead held that condition was insufficiently clear as a constitutional matter to mandate that the States pay expert fees, thus making plain that the Constitution demands clarity in what the conditions *are*, not merely that they *exist*. The district court patently erred by dismissing *Arlington*'s *core holding* and case-dispositive reasoning as mere "dicta."

Because the State has standing and the district court necessarily decided the merits of the State's claim already, this Court should reach the merits of the State's constitutional claims after determining it has Article III standing. Indeed, a remand to decide the merits would be futile

here because the district court has already pronounced dispositive holdings on the constitutional issues, and gravely erred in doing so.

Here, the constitutionality of the Tax Mandate is straightforward given its hopeless ambiguity. Indeed, the Departments of Justice and the Treasury cannot even agree *in this case* about what the Tax Mandate means and how it operates. And if two components of a unified executive cannot even settle on what the Tax Mandate means, the proposition that it presents clear, unambiguous conditions to the States is fanciful.

The Tax Mandate's unconstitutional ambiguity stems largely from two elements: (1) its unprecedented use of the impenetrable term "indirect offset;" and (2) its innumerable, unfillable textual gaps. Indirect or indirectly offset are not terms used elsewhere in the U.S. Code, and for good reason—they are woefully unclear. Literally any use of ARPA funds could be set to "indirectly offset" a broad tax cut. Beyond this vague term, the Tax Mandate leaves critical gaps unfilled; for example, the Tax Mandate does not specify what counts as a "reduction" in net tax revenue because there is no clear baseline. Nor does it make clear what counts as a "change" in State tax law. These and other gaps leave the States with no clear understanding of what it is accepting in taking on ARPA funds.

Nor can the Treasury Department's subsequent interim final rule cure the ambiguity in the Tax Mandate. That is so for several reasons: (1) only Congress can provide the requisite clarity under the Constitution; (2) even if Congress could delegate its Spending Clause authority to the Treasury Department, it has not done so here; and (3) even if it had, the rule itself does not actually eliminate the Tax Mandate's pervasive ambiguity, and the rule even adds yet more impenetrable conditions for the States to comply with.

## STANDARDS OF REVIEW

This Court reviews dismissal for lack of standing *de novo*. *See Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010). Similarly, "[t]he constitutionality of a statute is a legal question of law that [this Court] review[s] de novo." *See United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005).

## ARGUMENT

## I. THE STATE HAS ARTICLE III STANDING TO CHALLENGE THE TAX MANDATE

To have standing, the plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). This case primarily concerns the district court's determination that Arizona had failed to demonstrate an injury in fact. It did not appear to doubt traceability or redressability.

To establish injury-in-fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent." *Id.* at 1548.

The essence of the standing question is "the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The issue is not whether Arizona is entitled to relief as "standing in no way depends on the merits." *Warth*, 422 U.S. at 500. Instead, the standing inquiry considers merely whether Tax Mandate imposes some injury on Arizona, such that there exists a question which is "traditionally amenable to" the judicial process. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). In addition, States are entitled to "special solicitude" in the standing analysis. *Massachusetts v. EPA,* 549 U.S. 497, 518-20 (2007).

### A. Standing Must Be Evaluated Separately From The Merits

An elementary principle of standing is that analysis of the merits is distinct and separate from the question of whether there is standing. But the district court's analysis pervasively conflated these two inquiries. Throughout its analysis of Arizona's standing, the court made two fundamental errors: it disguised merits questions as questions of standing and repeatedly assumed the constitutionality of the challenged provision. Each of these errors alone would merit reversal.

As this Court has explained en banc, "standing analysis, which prevents a claim from being adjudicated for lack of jurisdiction, [cannot] be used to disguise merits analysis, which determines whether a claim is one for which relief can be granted if factually true." *Cath. League for Religious & C.R. v. City & Cty. of San Francisco*, 624 F.3d 1043, 1049 (9th Cir. 2010) (en banc).

Furthermore, a Court "must assume *arguendo* the merits of [the State's] legal claim" when evaluating its standing. *See Parker*, 478 F.3d at 377. Even if the Court ultimately disagrees with the merits of a legal claim, the Supreme Court has cautioned against "confus[ing] weakness on the merits with absence of Article III standing." *Arizona State*

*Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015).

If the district court had properly separated the jurisdictional analysis from its merits' conclusions, it would have seen the numerous injuries that the Tax Mandate inflicts on the State. Any of the injuries set forth below alone suffices to present a justiciable controversy. The district court's contrary conclusion necessary rests on its unstated conclusion that the Tax Mandate was constitutional—largely because it doubted that any of the requirements set forth by Supreme Court precedent actually existed. But they do. And the Tax Mandate squarely violates them.

## B. The Compliance Costs Imposed By The Tax Mandate Confer Standing

### 1. The Compliance Costs Are Cognizable Injury

Numerous courts have concluded that a regulatory burden typically satisfies the injury-in-fact requirement. *See, e.g.*, *Clark v. City of Lakewood,* 259 F.3d 996, 1007 (9th Cir. 2001) ("The Court routinely recognizes ... economic injury resulting from governmental actions ... as sufficient to satisfy the Article III 'injury in fact' requirement") (quoting *Clinton v. City of New York,* 524 U.S. 417, 432-33 (1998));

*Brackeen v. Haaland*, 994 F.3d 249, 297 (5th Cir. 2021) ("The imposition of regulatory burdens on State Plaintiffs is sufficient to demonstrate an injury..."); *Texas v. EEOC*, 933 F.3d 433, 446-47 (5th Cir. 2019) ("An increased regulatory burden typically satisfies the injury in fact requirement." (citation omitted)); *Lutheran Church-Missouri Synod v. FCC.*, 141 F.3d 344, 349 (D.C. Cir. 1998) (requirement to keep "detailed employment records" is sufficient injury in fact).

The severity of the regulatory burden is irrelevant: "For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *See Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020).

### 2. The State Will Incur Compliance Costs

Accordingly, all Arizona need show is that it suffers some additional costs as a result of the Tax Mandate. As stated above, the IFR requires States to report actual net tax revenue, the value of changes in tax policy, and spending cuts with documentation showing that the cuts can cover a tax revenue decrease under the rule. 86 Fed. Reg. at 26,810. The IFR also explicitly requires the States to break out and "identify any sources of funds that have been used to permissibly offset" tax changes. *Id.* at

26,807, 26,809 (requiring the States to "identify and calculate the total value of changes that could pay for revenue reduction due to covered changes and sum these items" and describing the procedures for doing so).

These mandates plainly impose some burden on the State. Indeed, the Treasury Department has expressly stated in its own rule that the reporting requirements "will generate administrative costs … includ[ing], chiefly, costs required to … file periodic reports with Treasury." 86 Fed. Reg. at 26,817. Indeed, it went so far as to "comment[s] to better estimate and account for these costs, as well as on ways to lessen administrative burdens." *Id.* Put simply, neither the Treasury Department nor the district court ever doubted that the Tax Mandate imposes compliance costs through the IFR.

These costs are the monitoring regime put in place to ensure the State complies with the unconstitutional provision. *Compare with California v. Texas*, 141 S. Ct. 2104, 2119-20 (2021) ("[T]he problem for the state plaintiffs is that these other provisions also operate independently [from the challenged provision]."). Although the ARPA does independently require States to make a "detailed accounting" of "all

modifications to the State's … tax revenue sources," see 42 U.S.C. §802(d), that requirement is far less broad and burdensome than what the IFR imposes specifically to enforce the Tax Mandate's "directly or indirectly offset" provision, and the statutorily required accounting makes no mention of spending cuts or offsets. *Id.* §802(c)(2)(A).

It would be incredible if this IFR provision—which is a significant constraint on the States and is complex enough to have an explanation covering several pages of the Federal Register, *see* 86 Fed. Reg. at 26,807-26,811—did not impose any costs on the States. Because it does impose significant costs, there is a justiciable controversy over the validity of the provision.

### 3. The District Court's Contrary Holding Conflated The Standing And Merits Inquiries.

The district court did not seriously dispute that ARPA imposed these compliance costs on the State. Instead, the court concluded that "it is within the Secretary's power, under ARPA, to request that Arizona identify funds used to offset tax changes…. These compliance costs are part and parcel of a clearly-stated ARPA condition." 1-ER-9.

This conclusion patently conflates standing with the merits. The questions of whether the condition is lawful and whether it is "clearly

37

stated" are the precise *merits-based* issues presented by Arizona's lawsuit. Here, Arizona alleged that the Tax Mandate was unconstitutional specifically because it failed to give the States sufficiently clear notice to allow them to knowingly or voluntarily agree to it. The district court's reasoning stands for the proposition that these costs are properly—*i.e. constitutionally*—imposed. But that is precisely the question that the district court held it lacked jurisdiction to reach.

The Secretary has no power *whatsoever* to enforce an unconstitutional provision. The district court thus necessarily worked backwards from its unstated—but unmistakable—conclusion that the Tax Mandate was constitutional to hold that any compliance costs resulting from it were not "injurious"—all while purporting to lack jurisdiction to reach the question of the Tax Mandate's constitutionality. That is a hopeless muddle that mangles both the standing and constitutional issues simultaneously. Those fundamental errors warrant decisive rejection by this Court.

**C.** **The Alleged Ambiguity Of The Tax Mandate Inflicts Cognizable Sovereign Injury On The State**

**1.** **Arizona Had A Right To An Offer It Could "Voluntarily And Knowingly Accept"**

Spending Clause legislation is "in the nature of" contract between sovereigns. *NFIB*, 567 U.S. at 519, 576-77 ("We have repeatedly characterized ... Spending Clause legislation as 'much in the nature of a contract." (citing cases)). Respecting States' right to voluntarily and knowingly accept the terms of this contract "is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Id.* at 577.

As a result, a State has a judicially enforceable interest in the offer of conditional funding from the Federal Government. This makes perfect sense—the State needs to *know* what the actual conditions are to *knowingly* accept them.

Indeed, it would be truly bizarre if the Constitution created requirements for the specific protection of particular parties but those very same parties lacked *standing* to challenge alleged violation of them. But under the district court's reasoning, an individual *imprisoned* by an alleged bill of attainder by Congress could lack *standing* to challenge that legislation if a district court implicitly disagreed with that individual's

merits-based characterization (while purporting to lack jurisdiction to pronounce a holding on that very subject). That cannot be the law.

This injury is also necessarily ripe as soon as the offer is available: at that time, the content of a spending condition is critical to the State's sovereign interest in knowingly accepting or rejecting that condition.

Arizona's injury from the federal government's failure to make a constitutionally acceptable offer is the same injury that gives plaintiffs standing in every unconstitutional-conditions case: being forced to choose between exercising its constitutional rights and receiving a government benefit. *See*, *e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52-53 & n.2 (2006). In challenges brought by other states to the Tax Mandate, district courts in both Alabama and Ohio recognized this as justiciable injury. *See West Virginia v. Dep't of the Treasury*, 21-cv-00465, 2021 WL 2952863 at *7 (N.D. Ala. Jul. 14, 2021) ("Their injury in fact is having to choose between forgoing a benefit (federal funds) or accepting that benefit on unconstitutional terms."); *Ohio v. Yellen*, No. 1:21-CV-181, 2021 WL 2712220, at *6 (S.D. Ohio July 1, 2021) (concluding that the relevant harm for standing is "the harm that arises when a State must ponder accepting an ambiguous deal").

Under ARPA, States could certify compliance and accept the funds as early as March 11, 2021, the date President Biden signed the Act into law. 42 U.S.C. §802(g)(1). From that date, Arizona was effectively considering the offer from the federal government of funds and the condition of the Tax Mandate. Arizona filed this lawsuit on March 25, 2021. The existence of an injury for purposes of standing depends on "the facts as they exist when the complaint is filed." *Lujan*, 504 U.S. 555 at 569 n.4. Accepting Arizona's characterization of the Tax Mandate as unconstitutional, at the moment of filing the State was choosing between accepting the unconstitutional and indecipherable Tax Mandate or foregoing a benefit. This is an amply sufficient injury-in-fact.

### 2.    The District Court Wrongly Conflated The Merits In Judging the States' Interest

The district court rejected this injury, instead concluding that Arizona had no legally protected interest because *Pennhurst* and *Arlington* were "not tasked with determining what conditions would trigger such an obligation—the question was whether such an obligation existed at all. Anything in those two cases beyond the issue of whether a condition existed, then, is dicta." 1-ER-7 (quotation marks omitted). According to the district court, because Congress made "the existence of

the condition upon which Arizona could accept funds explicitly obvious" Arizona had not "suffered a cognizable injury." 1-ER-7. (internal quotations omitted).

This was a quintessential merits determination, disguised as a jurisdiction one. This was evident in the court's ostensible reliance on *Mayweathers*, 314 F.3d at 1062, since that case was itself a decision on the merits and not jurisdictional *at all*.

The district court's explicit acknowledgment and discussion of the core question in the case—whether the government's condition was sufficiently clear for Arizona to knowingly and voluntarily accept the terms offered—demonstrates that this was effectively a merits decision. Instead of engaging with the merits in the guise of standing, the district court should have assumed *arguendo* the correctness of Arizona's claim, meaning the only question for the court was whether the Tax Mandate's assumed failure to permit the State to voluntarily and knowingly accept the terms of the condition inflicted a sufficiently "concrete and particularized" and "actual or imminent" injury. *See Spokeo,* 136 S. Ct. at 1548.

Compare the district court's decision with *Arizona State Legislature*, 576 U.S. at 800. In that case, the Supreme Court disagreed with the Arizona Legislature on the merits of their claim that they had an exclusive role in redistricting. But that merits holding did not prevent the Court from concluding that Arizona's "alleged prerogative" was sufficient to establish cognizable injury. *Id.* Similarly here, Arizona's allegation that it was denied the right to knowingly and voluntarily accept the terms of the Tax Mandate was sufficient to establish the State's standing.

### D. Arizona Suffers An Injury Because The ARPA Coerced The State And Effectively Commandeered State Taxing Authority

Congress's enumerated powers do not include the power to issue orders to, or "commandeer," state governments. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). The Supreme Court has repeatedly stated that Congress lacks "the ability to require States to govern according to Congress' instructions." *New York*, 505 U.S. at 162 (citing *Coyle v. Smith*, 221 U.S. 559, 565 (1911)). "[E]conomic dragooning that leaves the States with no real option but to acquiesce" crosses the line from permissible

persuasion to impermissible coercion and effectively amounts to commandeering. *NFIB,* 567 U.S. at 582.

Courts have recognized such commandeering as an injury to a States' sovereign constitutional rights. *See, e.g., New York*, 505 U.S. at 154. (permitting State to proceed with declaratory challenge to the constitutionality of the Low-Level Radioactive Waste Policy Amendments Act of 1985); *Oregon v. Trump*, 406 F. Supp. 3d 940, 958 (D. Or. 2019) ("A state or locality has standing to challenge interference with its operational and governance decisions.") (citing cases). It similarly injures Arizona here.

The district court disagreed with this solely based on its analysis of the facts, again conflating the merits with standing. 1-ER-11 ("Arizona has not alleged facts showing that *it* has undergone financial strain…. Arizona has not alleged facts showing it had no real option but to acquiesce."). This analysis is simply irrelevant, as explained in more detail below. But more importantly, the district court, for purposes of standing at least, should have accepted Arizona's arguments as true. *See Parker*, 478 F.3d at 377. Its failure to do so underscores its conflation of standing with the merits.

### E. Arizona Suffers A Realistic Danger Of Enforcement Of The Tax Mandate

Even if this Court were to conclude none of the above injuries established standing, the threat of potential enforcement of the Tax Mandate would also suffice here.

To establish standing based on threatened enforcement, the State needed to show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *See Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). This Court considers three factors for evaluating the genuineness of a threat of prosecution: "[1] whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *See California Trucking Ass'n v. Bonta*, 996 F.3d 644, 652 (9th Cir. 2021) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000) (en banc). Here, all three of these factors are met.

First, Arizona has done more than articulate a "concrete plan"—Arizona has passed a $1.9 billion tax cut and accepted billions in ARPA funding. 2-ER-21. While Arizona certified (prior to passing the tax cut) that it would not violate the Tax Mandate, the Tax Mandate's sweep is so broad and uncertain, Arizona could reasonably certify under its own reasonable reading of the language and yet still face an enforcement action by the Treasury Department. The IFR itself contemplates Treasury's review of inadvertent decreases in tax revenue and oversight of past conduct for "indirect offsets"—in Treasury's sole judgment. *See* IFR, 86 Fed. Reg. at 26,810.

On the second factor, the IFR itself is an explicit threat of enforcement. Furthermore, the federal government has not "disavow[ed] enforcement" of the Tax Mandate, which is "strong evidence that the [government] intends to enforce the law." *Bonta*, 996 F.3d at 653. Finally, on the third factor, "this factor has 'little weight' when the challenged law is relatively new and the record contains little information as to enforcement or interpretation." *Id.* (internal quotations omitted).

Ultimately, then, this case is like *Babbitt*: there, the statute also had never been applied, and governmental body charged with

enforcement had not disavowed its intent to enforce it. *Babbitt*, 442 U.S. at 302. As the Court explained, standing existed there because "Appellees [we]re thus not without some reason in fearing prosecution." *Id.* So too here: Arizona has passed a large tax cut which would seem to "indirectly offset" at least some of its ARPA spending. And the Treasury has not disavowed enforcement—it has actively pursued rulemaking to put the framework into place to bring future recoupment actions and implicitly disavowed DOJ's more narrow interpretation that might have given the States comfort that enforcement actions were not forthcoming. Accordingly, Arizona has standing.

The district court's disagreement was founded on its assertion that Arizona had not "claim[ed] to have directly or indirectly used ARPA funds to supplement a reduction in its net income." 1-ER-10. But this is tantamount to requiring Arizona to admit to violating the statute as a prerequisite to suit. Article III does not "require plaintiffs to 'bet the farm by taking violative action' before 'testing the validity of the law.'" *Free Enter. Fund v. Pub. Accounting Oversight Bd.*, 561 U.S. 477, 490 (2010) (quoting *MedImmune, Inc. v. Genentech*, 549 U.S. 118, 129 (2007)) (alteration omitted). Arizona was entitled to protect itself by claiming

funds while acting consistent with its understanding of the law. Under *MedImmune*, this does not preclude the State from challenging the statute based on Treasury's interpretation of the extremely vague language, as set forth in the IFR.

For all these reasons, Arizona has standing to challenge the Tax Mandate.

## II. THE TAX MANDATE IS UNCONSTITUTIONAL

The State not only has Article III standing, but its constitutional claims are also meritorious. Indeed, the district court's opinion implicitly—but unmistakably—rejected the State's merits arguments in the course of dismissing the State's suit.

This Court therefore cannot meaningfully review the district court's reasoning without considering (or at least disentangling) the merits issues that pervade the opinion below. Indeed, a remand to decide the constitutional issue would be futile because the district court has already decided them (holding, for example, that the Tax Mandate was not unconstitutionally ambiguous because Congress need only give notice of the *existence* of the conditions, not its actual content, *supra* at 23-24.

Moreover, this appeal presents purely legal issues that would not benefit from any further development below.

This Court accordingly should (and effectively must) resolve the constitutional challenges presented here. And because the Tax Mandate is unconstitutional, this Court should direct entry of judgment in favor of the State on remand.

On the merits, the Tax Mandate violates the Constitution principally because it is ambiguous, and thus does not supply the requisite clarity that the Constitution demands. But even if the statute was clear, under Treasury's interpretation it remains a grave encroachment upon the States' sovereign taxing powers and a transgression upon the limitations recognized in *Dole* and other cases.

## A. The Tax Mandate's Palpable Ambiguity Violates The Constitution

### 1. The Tax Mandate Is Patently Ambiguous

As explained above, conditional grants under the Spending Clause are "in the nature of a contract" and their constitutional "legitimacy" rests on whether States can both voluntarily and knowingly accept the terms. *Pennhurst*, 451 U.S. at 17. The condition in question must be viewed "from the perspective of a state official who is engaged in the

process" of deciding whether to accept the funds. *Arlington*, 548 U.S. at 296.

Thus, unlike a traditional statutory interpretation case, the question under the *Pennhurst* inquiry is not what the "best" reading of the statutory language is. Instead, the court only need determine whether the statute allows state officials to "clearly understand" the obligations that go with the funds, and whether the condition furnishes "clear notice" regarding the potential liability the State would face. *Id.* Absent such unambiguous clarity, Congress's attempt to impose a condition upon the States through its Spending Clause power is unconstitutional because no state can voluntarily or knowingly agree to the condition.

This limitation is not solely about protecting a State's contractual integrity. Rather, this is a limitation on Congress's Spending Clause powers to protect the fundamental federal, dual-sovereign character of our Republic. Justice Scalia's dissent for four justices in *NFIB* explained the potential reach of the Spending Power, if unchecked: "[T]he Spending Clause power, if wielded without concern for the federal balance, has the potential to obliterate distinctions between national and local spheres of

interest and power by permitting the Federal Government to set policy in the most sensitive areas of traditional state concern, areas which otherwise would lie outside its reach." *NFIB*, 567 U.S. at 675-76 (Scalia, J., dissenting) (citation omitted). To maintain this balance, federal spending clause legislation must be unambiguous and must allow the States to make an "informed choice." *Id.* at 676-77.

In this context, ambiguity functions much like coercion. In both cases, the States' ability to make an "informed choice" is destroyed, with ambiguity vitiating the "informed" part and coercion precluding a true "choice." Without this limitation, Congress effectively could impose its will on the States through the power of these conditions, undermining the federal-state balance.

The question then is whether the Tax Mandate is so ambiguous as to deprive the States of voluntary and knowing choice. While the Supreme Court stated in *Arlington* that a court evaluating ambiguity should "begin with the text," 548 U.S. at 296, the text of the Tax Mandate begs more questions than it answers. Consider a few of the questions its language leaves unresolved: First, the Tax Mandate does not explain the limits (if any) on when ARPA funds "indirectly offset" a reduction in net

tax revenue. For example, if a state uses the federal funds from the Act to supplement the pay of its essential government employees, as expressly permitted by the ARPA, thereby reducing its own budgetary obligations to pay such workers, and then proceeds with a pre-existing plan to cut income taxes, has any tax reduction been indirectly offset? Does it matter if the money comes out of a different fund than where the ARPA grant is directly utilized?

Second, the Tax Mandate does not explain what the baseline is for when a "reduction" in in the "net tax revenue" has taken place. For example, if the State revenues were projected to increase in 2022 by $500 million, and the state instituted an income tax reduction reducing this revenue increase to be only $450 million, would that be a "reduction in net tax revenue?"

Third, can an indirect offset be diminished or eliminated over time? If a state uses funds from the Act in 2021, is it bound until 2024 from any policy change which reduces net tax revenue? The text is largely silent on these questions.

The only district court to reach these merits questions had little difficulty in holding that Tax Mandate is unconstitutionally ambiguous.

As explained by the *Ohio* court, "the Tax Mandate, even when read in context, fails to put the State on 'clear notice' of its obligations, under any reasonable definition of 'clear.'" *Ohio*, 2021 WL 2712220, at *12 (citations omitted). The court noted a series of ambiguities; for example, "the statutory language itself provides no mechanism for determining whether a State's net tax revenues are 'reduced' or not;" "the statutory language does not explain whether the prohibition applies to *expected* tax revenues, or *actual* tax revenues;" "the Court … could not ascertain what an indirect offset may (or may not) be." *Id.* at *13 - *14. Furthermore, the *Ohio* court observed that these definitions are so broad that "the Secretary could deem essentially *any* reduction in the rate of any one or more state taxes" to be a change in tax laws resulting in an indirect offset. *Id.* at *15.

With these uncertainties, the States are not presented with an "informed choice." They can accept the funds, but they cannot know what they are signing on for. Accordingly, the Tax Mandate is an illegitimate exercise of the Spending Power.

### 2. The Tax Mandate's Ambiguity Is Apparent From DOJ's And Treasury's Conflicting Interpretations Of It

The Tax Mandate has been subject to shifting interpretations throughout its short lifetime. The Secretary—an economics professor and former Federal Reserve Chairwoman—acknowledged in her testimony to the Senate Banking Committee that the Tax Mandate raises a "host of thorny questions" and "given the fungibility of money, it's a hard question to answer."[8] Despite this, she (*i.e.*, DOJ) contended before the district court that the statute was completely unambiguous, and that its meaning was *clear*: its application was limited to "volitional" or "active employment" of federal funds. 2-ER-83.

Finally, the IFR, which was published during the pendency of this litigation, announced a new interpretation, contradicting Treasury's/DOJ's litigation position. In fact, the IFR recognizes (as the Secretary did) that "money is fungible" and specifically states that "even if Fiscal Recovery Funds are not explicitly or directly used to cover the cost of changes that reduce net tax revenue, those funds may be used in

---

[8] *See supra* note 6.

a manner inconsistent with the statute by indirectly being used to substitute for" a tax revenue reduction in a manner amounting to an indirect offset. 86 Fed. Reg. at 26,807.

These interpretations are set forth below:

| Table 1: Defendants' Shifting Interpretations | |
|---|---|
| **Defendants' Response (April 30, 2021)** | **Interim Final Rule (May 17, 2021)** |
| "The term **'use' connotes 'volitional' 'active employment' of federal funds**…. [T]he Act's reference to States **'directly or indirectly'** offsetting a reduction in net tax revenue **does not alter the statutory meaning. Both 'directly' and 'indirectly' are adverbs that cannot 'alter the meaning of the word'** that they modify (here, 'offset')." | "**[E]ven if Fiscal Recovery Funds are not explicitly or directly used** to cover the cost of changes that reduce net tax revenue, those funds may be used in a manner inconsistent with the statute **by indirectly being used to substitute for the State's or territory's funds** that would otherwise have been needed to cover the costs of the reduction." |

Put simply, depending on when DOJ and the Treasury Department were asked: (1) the Tax Mandate either *does or does not* require "active employment" of ARPA funds to offset revenue reductions, and (2) "indirectly" either does—or does not—modify "offset." (One might also fairly wonder what linguistic function DOJ thinks adverbs serve *other*

than "alter[ing] the meaning of the word' that they modify" 2-ER-83. Indeed, the *sole* purpose of adverbs is modifying verbs, adjectives, and other adverbs.)

These shifting interpretations demonstrate by themselves the dilemma placed on the States by the Tax Mandate. How could the State knowingly and voluntarily agree to this language when the Secretary cannot convincingly articulate its meaning even during litigation? They cannot: the States can "accept" these terms, but they cannot know what they actually mean. If Congress could present States with conditions of this type, it would violate fundamental tenets of federalism.

3.  **The Supreme Court's Precedents Demand Clarity As To What The Conditions Imposed Actually Are—Not Their Mere Existence**

The district court, in the guise of evaluating Arizona's standing, decided that Arizona did not have a constitutional right to unambiguous conditions at all. Instead, declaring itself bound by *Mayweathers*, 314 F.3d at 1062, the district court held that as long as Congress makes the *existence* of a condition known, Congress has satisfied its duty. But gravely misreads *Mayweathers* and squarely violates controlling Supreme Court precedent.

*Mayweathers* involved a facial challenge to the constitutionality of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000cc *et seq.* (2000) ("RLUIPA"), on various grounds. 314 F.3d at 1065. RLUIPA states that it applies to any "program or activity that receives Federal financial assistance" and requires that governments not impose a substantial burden on the religious exercise of prisoners unless the government can demonstrate that the burden both serves a compelling government interest and is the least restrictive means of advancing that interest. *Id.* at 1067 (quoting (42 U.S.C. §2000cc-1(b)(1)).

Plaintiffs challenged this aspect of RLUIPA as ambiguous under *Dole* and *Pennhurst.* This Court disagreed, explaining that "[t]he fact that the least restrictive means standard is perhaps unpredictable because it has resulted in different determinations in different courts does not weaken the express conditional language." *Id.* at 1067.

The district court wrongly understood *Mayweathers* as standing for the proposition that the State has no right to know the *content* of a condition *whatsoever*; it was enough for Congress to make clear that there is *a* condition, regardless of whether *any* of its contours are knowable. 1-ER-8.

This was a wild overreading of *Mayweathers*, which simply stated a principle that the State agrees with—Congress is not required to "list every factual instance" in order to promulgate a non-ambiguous condition. This is what this Court meant when it said Congress must "make the condition itself explicitly obvious." *Mayweathers*, 314 F.3d at 1067.

As discussed above, Arizona does not suggest that the Tax Mandate need to set forth "every factual instance" to be unambiguous. Rather, the dispositive threshold is whether the condition gives the States "clear notice" about what is required, so they can knowingly and voluntarily accept the conditions. *Arlington*, 548 U.S. at 296. Put simply, the States need not know how every conceivable factual permutation would be treated by Congress's condition. But they *are* entitled to clear notice of the *fundamental contours* of the proposed deal. The Tax Mandate, with its innumerable, critical gaps and the indecipherable use of "indirect offset," cannot satisfy this threshold.

The district court's reading—that this substantive uncertainty does not matter—cannot be squared with the Supreme Court's decisions in *NFIB* and *Arlington*, both of which post-dated *Mayweather*. As the *Ohio*

court explained, the Supreme Court in these cases "directly reject[ed]" the view that the substance of conditions is irrelevant. *Ohio v. Yellen*, No. 1:21-CV-181, 2021 WL 1903908, at *12 (S.D. Ohio May 12, 2021) ("First, the federal government claimed that the Spending Clause does not require that the *substance* of the conditions be clear, but merely that the statute make clear that conditions *exist*. Wrong. As noted above, Supreme Court and Sixth Circuit precedent directly reject that view.").

In *Arlington*, the Court was clear that it was the content of the condition which mattered. That case dealt explicitly with a provision in the Individuals with Disabilities Education Act ("IDEA"), which provides that a court in an IDEA case may award "reasonable attorneys' fees as part of the costs." 548 U.S. at 293-94 (citation omitted). The question presented there was whether IDEA permitted prevailing parents to recover expert fees as a part of "costs," as seemed to be suggested by legislative history. *Id.*

In resolving that question, the Court made clear that "[i]n a Spending Clause case, the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Id.* at 304.

Applying that logic, the Court held that States could only be bound to the narrow understanding of the condition, since obligating States to cover attorneys' fees would go beyond what States were "clearly told." *Id.*

But if the *existence* of the condition was all that mattered, there would have been no need to apply this narrowing principle on the meaning of "costs"—the Supreme Court could simply have observed that the existence of the IDEA's requirement to pay "costs" was obvious and affirmed on that ground alone. But the Court actually *reversed* the judgment below, and its holding was expressly premised on the need for clarity as to the *content* of the IDEA's condition, not merely its *existence*. That distinction was case dispositive in *Arlington* and not, as the district court held, irrelevant "dicta." 1-ER-7. It was the *core holding*.

Similarly, as explained above in *NFIB*, seven Justices struck down a condition in the Affordable Care Act that imposed additional Medicaid requirements on the States. *NFIB*, 567 U.S. at 575-76 (Roberts, C.J.). Both opinions reaching this conclusion in the case explained the importance of the State being able to both "knowingly" and "voluntarily" accept the conditions offered for the exercise Spending Clause power to be "legitima[te]." *Id.* at 577. *See also NFIB*, 567 U.S. at 676-77 (Scalia, J.,

dissenting). But a State cannot *knowingly* accept a condition without *knowing* what it does. The district court's contrary conclusion is a contradiction in terms that contorts the Supreme Court's holdings beyond recognition.

The district court simply misread *Mayweathers* to reach a contrary conclusion. But even if *Mayweathers* did actually hold that nothing more than disclosure of the *existence* of a condition was required, it is directly contrary to *Arlington*, which is intervening authority that necessarily overrules it. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

### 4. Treasury's Rule Cannot Cure The Tax Mandate's Ambiguity

The IFR cannot cure the problems caused by Congress's failure to give the States clear notice on the Tax Mandate's meaning. As the Fourth Circuit held in an en banc decision, "statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies" notwithstanding any subsequent regulation. *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (adopting opinion of Luttig,

J., dissenting below). This Court would have to create a square and unwarranted circuit split to hold otherwise.

This limitation stems from the nature of the Spending Clause restriction requiring ambiguity. As recognized by the *Ohio* decision, the Spending Clause jurisprudence reflects "structural concerns about protecting federalism" as well as protecting the States' "contractual autonomy." *See Ohio*, 2021 WL 2712220, at *17. Those structural concerns would be undermined if "mere congressional *ambiguity* would evade the [political process] on which *Garcia* relied to protect states' interests." *See Riley*, 106 F.3d at 567 (adopting opinion of Luttig, J., dissenting below) (quoting *Gregory*, 501 U.S. at 464). The Supreme Court has required knowing and voluntary acceptance not simply to protect states from exploitation, but to ensure that Congress's Spending Clause power does not, as Justice Scalia wrote in *NFIB*, "'obliterate distinctions between national and local spheres of interest and power by permitting the Federal Government to set policy in the most sensitive areas of traditional state concern.'" *See NFIB*, 567 U.S. at 675-76 (Scalia, J., dissenting) (citation omitted)). This purpose would be destroyed if Congress could simply delegate its responsibility to make clear conditions

to an executive agency, leaving those conditions both subject to change and subject to the whims of the Executive Branch.

Furthermore, as the *Ohio* court recognized, even if Congress could delegate the responsibility to issue clear conditions, "Congress must provide for such delegation in clear and unambiguous terms. And Congress did not do so here." *Ohio*, 2021 WL 2712220, at *15. Following the logic of the Supreme *Court's* decision in *King v. Burwell*, 576 U.S. 473, 485-86 (2015), the district court observed that the Tax Mandate involves "question[s] of deep 'economic and political significance.'" *Ohio*, 2021 WL 2712220, at *19 (quoting *King*, 576 U.S. at 486). Accordingly, if Congress had wished to assign that question to the Secretary, "it surely would have done so expressly." *Id.*

Furthermore, the structure and context of the statute provide strong evidence that "Congress considered the terms of the deal to be complete" without Treasury's interpretation. *Id.* at *20. Notably, the States were permitted to accept ARPA funds immediately—before Treasury could even conceivably have issued any regulations. *Id.* That is strong evidence that Congress intended no such delegation. Ultimately, the Tax Mandate must "sink or swim on its own." *Id.*

The government below argued that *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656 (1985) permits the Treasury to clarify an ambiguous condition. 2-ER-85. In *Bennett*, the Court considered an effort by the Federal Government to recover Title I funds that were allegedly misused by a State, in part because the conditions for obtaining those funds was too ambiguous. *Bennett,* 470 U.S. at 658. There, the conditions in question were generally set out in regulations. But as the Supreme Court explained, "[t]he requisite clarity in this case is provided by" the statute. *See id.* at 666. The Court went on to say that every improper expenditure need not be "specifically identified and proscribed in advance" for a condition to be constitutional. *Id.* But that reasoning was conditioned upon the statute itself first providing the "requisite clarity."

Arizona agrees that regulations can be used to clarify and set out ancillary details if the text of a Spending Clause condition clears the initial constitutional "requisite clarity" threshold. But if it fails to do so, no regulation can rescue it.

## 5. Treasury's Rule Does Not Offer Sufficient Clarity To Give The States Clear Notice

Even if a regulation theoretically could "cure" a lack of sufficient clarity in the statutory text, however, the IFR here does not do so. Indeed,

the ultimate takeaway from the IFR is that, even in a rulemaking, the Federal Government is still unable to articulate coherent guidelines on what violates the Tax Mandate. Although the IFR does fill some of the gaps in the statute—such as the relevant baseline and the meaning of tax reduction—in critical areas the IFR either ducks critical issues or actually makes the ambiguity worse. Indeed, rather than clarifying the Tax Mandate's meaning, the IFR often simply parrots the statute or actually exacerbates the ambiguity by adding yet-more vague requirements for the States to navigate. That compounds—rather than cures—the Tax Mandate's ambiguity.

For example, the Interim Rule says that a loss in tax revenue counterbalanced by a "spending cut" is not "indirectly offset" by Revenue Plan funds. 86 Fed. Reg. at 26,808. But this includes "only spending reductions in *areas* where the recipient government has not spent Fiscal Recovery Funds." *Id.* at 26,810 (emphasis added). And the Interim Rule does not define "areas" at all, creating yet another ambiguity.

But given the broad scope of the permissible uses to which Rescue Plan funds can be put, many spending cuts could be linked to an "area" supported with Rescue Plan funds by the Treasury. And since money is

"fungible," *id*. at 26,807, a State can never really know—and it will be up to the unilateral discretion of the Treasury to determine—whether a spending cut is in the same "area" as ARPA spending. And so the IFR simply lands the State back where it was before the rulemaking—in ignorance about when an "indirect offset" takes place. Even if a regulation could remedy unconstitutional ambiguity, this IFR does not.

In some ways, the IFR actually starkly illustrates the ambiguity inherent in the Tax Mandate by its ham-handed efforts to fill its gaps. For example, the IFR states that "income tax changes—even those made during the covered period—that simply conform with recent changes in Federal law (including those to conform to recent changes in Federal taxation of unemployment insurance benefits and taxation of loan forgiveness under the Paycheck Protection Program) are permissible under the offset provision." 86 Fed. Reg. at 26,808.

*Nowhere* is this exception justified with reference to the statutory text—because it simply cannot be. The plain text of the Tax Mandate states that it applies to any "change in law, regulation, or administrative interpretation during the covered period." There is no textual justification for exempting a change which conforms state law to federal

taxation. Indeed, conforming to the federal exemption of this income from taxation fits quite easily within "a reduction in the net tax revenue." 42 U.S.C. §802(c)(2)(A).

Treasury's decision to pluck this exemption purely out of the ether demonstrates the ambiguity and incompleteness of the Tax Mandate. Furthermore, if Treasury can craft this exemption without reference to the ARPA's text, how can the IFR be treated as the final settlement of all these unsettled questions? A challenger with standing could unravel this and other parts of the IFR that are without a firm footing in the statutory language. This further illustrates how a regulation cannot resolve constitutional defects.

## B.    The Tax Mandate Is Not Related To ARPA's Purposes

While the relatedness requirement is generally a "low-threshold" test, *see Mayweathers*, 314 F.3d at 1067, there must still be "some relationship" between the condition imposed and the purpose of the federal spending. *See New York*, 505 U.S. at 167. The Tax Mandate fails to surmount this requirement for two reasons.

*First*, the Tax Mandate is far too sweeping. The ostensible purpose of the Act is to assist states in responding to the economic impact of the

COVID-19 pandemic. But in prohibiting states from making any tax reduction, no matter the justification or causal relationship to the aid funds, possibly years after the impact of the pandemic has dissipated, even this low threshold test is stretched to the breaking point. *See City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 640-43 (E.D. Pa. 2017) (concluding that the interest of "enhancing *local* criminal justice" which motivated the Byrne JAG grant statute was not sufficiently related to national interest in immigration enforcement).

*Second*, the Tax Mandate is not only lacking a rational relationship to the purpose of the State aid—it affirmatively violates the Act's express (and actual) purposes. Notably, the Act expends a truly enormous amount of money as stimulus through tax cuts and direct payments to taxpayers: approximately $593 billion in all. See 3-ER-250-55, 366-70. Congress thus made its own determination through the Act that substantial tax relief (as well as spending) was appropriate to stimulate the U.S. economy. Barring the States from engaging in any form of stimulus through tax relief is shown as irrational by Congress's own actions. In essence, Congress's message to the States is "Tax cuts for me,

but not for thee." But this flagrant hypocrisy does not satisfy the relatedness requirement.

Similarly, Congress's decision to apply the Tax Mandate only to the States and not local governments, underscores the lack of any rational relationship between ARPA's purposes and the Tax Mandate. Either macroeconomic stimulus through tax relief serves ARPA's purposes or it does not. But Congress's decision to hamstring States—but not local governments or itself—in enacting such stimulus has no legitimate connection to ARPA's purposes.

## C. ARPA Unconstitutionally Coerces States Into Accepting The Tax Mandate

ARPA provides Arizona with $4.9 billion in a time of unparalleled economic contraction. This is nearly 10% of Arizona's projected FY2022 budget. *See* 2-ER-102-72, 3-ER-250-55. In the current economic situation, Arizona cannot turn down this "financial inducement." *NFIB*, 567 U.S. at 580 (Roberts, C.J.). In *NFIB*, the Court addressed Medicaid spending which "account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." *Id.* at 581.

The amount of funds at stake in this case is similar to that at issue in *NFIB*, leaving the states with "no real option" but to take the funds

and the strings attached to them. *Id.* at 582. As the Joint Dissent in *NFIB* explained (largely in agreement with the Chief Justice): "Even if a State believes that the federal program is ineffective and inefficient, withdrawal would likely force the State to impose a huge tax increase on its residents, and this new state tax would come on top of the federal taxes already paid by residents to support subsidies to participating States." *Id.* at 680 (joint dissent). In the situation presented by the COVID-19 economic crisis, it is coercion to impose policy conditions to such vast funding.

The threat of the Tax Mandate to the constitutional balance of power is evident in its irreconcilability with the justifications of anticommandeering doctrine, which serves two main purposes. First, anticommandeering enshrines the "structural protections of liberty" inherent in the federal system. *Printz v. United States*, 521 U.S. 898, 921 (1997). By dividing power among multiple sovereigns, the Constitution reduces the risk of tyranny. *See New York*, 505 U.S. at 187. Second, the anticommandeering doctrine protects lines of political accountability. By preventing the federal government from ordering the state governments into adopting federal policy, anticommandeering ensures that

accountability resides directly in the source of a particular policy, rather than allowing federal policy to be concealed through a state government intermediary. *Id.* at 169.

The Tax Mandate, however, runs contrary to these purposes. *First*, it undermines structural protections of liberty. The state's independence in broad tax policy is an important value. Congress is, of course, perfectly within its rights to disfavor tax cuts as a matter of federal policy. However, if Congress could use coercive grants to buy the state's compliance with federal tax policy, the nation would be limited to a single sovereign governing overarching tax policy in both the federal and state governments. In addition to threatening liberty, this would undermine the states' role as "laboratories of democracy." *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting).

*Second*, the Tax Mandate undermines political accountability. With the Tax Mandate, the federal government takes the power to lower taxes away from state governments—but not the responsibility for their tax rates. It will be state and local legislators who are stuck with the tax rates the federal government has imposed on them through 2024. Those officials will "bear the brunt of public disapproval" while Congress

"remain[s] insulated from the electoral ramifications of their decision."
*New York*, 505 U.S. at 169. Congress cannot blur responsibility in this
fashion, even by using the expedience of the Spending Clause.

The Tax Mandate also undermines democratic accountability at the
state level as well. Take, for example, candidates for state legislatures
that categorically oppose all tax cuts. That unpopular position might
easily cost them votes. But the Tax Mandate lets them duck
accountability and claim that their opposition to tax cuts is based on their
illegality under federal law. Similarly, candidates that favor tax cuts may
not be able to run effectively on that platform as voters may correctly
recognize that electing such candidates is unlikely to delivery any actual
state tax relief, since the Tax Mandate may simply invalidate them or
make them too costly to enact.

The district court rejected the State's standing to bring this claim
because, as the court claimed, Arizona had failed to allege facts showing
that it had undergone financial strain. This misunderstands the legal
inquiry presented by the coercion standard. In *NFIB*, neither of the
opinions applying the coercion analysis asked whether the plaintiff states
had, themselves, experienced special financial strain. Rather, as

explained previously, the inquiry was focused on the offer prevented the States from engaging in knowing and voluntary choice. The federal government is permitted, under the Spending Clause, to engage in "relatively mild encouragement" to induce states to adopt specific policies Congress would not be able to force them to adopt. *NFIB*, 567 U.S. at 581 (op. of Roberts, C.J.) (quoting *Dole*, 483 U.S. at 211). But Congress may not put a "gun to the head" to force this adoption. Here, the gun is evident. Irrespective of Arizona's particular financial strain, no State can afford to turn down this money. Moreover, *NFIB* is utterly bereft of any suggestion that the Affordable Care Act could have been unconstitutionally coercive for some states and not others. Instead, federal courts have always looked to whether the choice presented was coercive to the States generally as a whole.

Given its scope, its purpose, and the vast amount of funding being used to buy these key elements of state sovereignty, the Tax Mandate is unconstitutionally coercive.

# CONCLUSION

For the foregoing reasons, this Court should reverse the district court's dismissal on standing grounds and direct that court to enter judgment in favor of the State on remand.


Respectfully submitted,

MARK BRNOVICH
ATTORNEY GENERAL

s/ Drew C. Ensign

Joseph A. Kanefield
   *Chief Deputy & Chief of Staff*

Brunn ("Beau") W. Roysden III
*Solicitor General*

Drew C. Ensign
   *Deputy Solicitor General*
Wilson C. Freeman
   *Senior Litigation Counsel*
Robert J. Makar
   *Assistant Attorney General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (802) 542-5025
Drew.Ensign@azag.gov

*Counsel for the State of Arizona*

# CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)** 21-16227

I am the attorney or self-represented party.

**This brief contains 13,993 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
　　[ ] it is a joint brief submitted by separately represented parties;
　　[ ] a party or parties are filing a single brief in response to multiple briefs; or
　　[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _s/ Drew C. Ensign_____ **Date: 8/20/21**.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 20th day of August, 2021, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants.

<u>s/ Drew C. Ensign</u>
Drew C. Ensign